(60 South. 256.)

No. 19,111.

COX et al. v. BUSCH–EVERETT OIL CO. et al.

(Dec. 16, 1912. Rehearing Denied Jan. 6, 1913.)

*(Syllabus by the Court.)*

1. HUSBAND AND WIFE (§ 267*)—COMMUNITY PROPERTY — DEED—VALIDITY — FAILURE TO DELIVER.

A notarial act executed by the husband, purporting to grant, bargain, and sell the property of the community to two of his sons (and which leaves the grantor and his wife without means of support), for the recited consideration of an obligation on the part of the grantees to take care of the grantor and his wife for the balance of their lives, to which act neither of the grantees is a party and of which they had no knowledge at the time of its execution, which was delivered by the grantor to his wife, with instructions to keep it until her death, and which never saw the light until after the death of the grantor, is without effect, either as a sale, a giving in payment, a donation inter vivos, whether remunerative or onerous, or as a disposition mortis causa, and, on the death of the husband, the property, purporting to be affected by it, devolves, according to law, as though no such act had been executed.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 929–952; Dec. Dig. § 267.*]

2. HUSBAND AND WIFE (§ 267*)—COMMUNITY PROPERTY—VOID CONVEYANCE—DONATIONS —ESTOPPEL.

Where an instrument in writing, purporting to be a contract in the form of an onerous donation, is executed by the master of the community, and he therein declares that he "sells" the community property in consideration of an obligation on the part of the grantee to take care of the grantor and his wife for the balance of their lives—the property described including practically all that he and his wife possess—and the grantee is not a party to the act, which is delivered to the grantor's wife, to be kept until her death, and is so kept until after the death of the grantor, when, without the knowledge or consent of the widow, it is taken by the grantee and recorded, the widow is not estopped, by silence or inaction or even by apparent acquiescence, to assert her rights in the property as against the grantee, or as against those holding under him, to whom knowledge of the nullity of the grantee's title may be brought home or imputed, since the instrument is, in law and in fact, no contract and divests no title, and the contract which it purports to witness is prohibited by a law enacted in the interest of public order and good morals; nor is a child of the deceased master of the community so estopped to claim his inheritance in the property purporting to be affected by such instrument.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 929–952; Dec. Dig. § 267.*]

Appeal from First Judicial District Court, Parish of Caddo; Edgar W. Sutherlin, Judge.

Suit by Mrs. Martha A. Cox and others against the Busch-Everett Oil Company and others. Decree for defendants, and plaintiffs appeal. Reversed and rendered.

Hall & Jack, of Shreveport, for appellants. Alexander & Wilkinson, of Shreveport, for defendants appellees. Blanchard, Barret & Smith, of Shreveport, for other appellees.

### Statement of the Case.

MONROE, J. This is a suit for the recovery of certain interests in the S. W. ¼ of section 29, township 22, range 15 west, in the parish of Caddo. The petition alleges that Mrs. Cox is the widow, in community, of John A. Cox, Sr., and that Mrs. Grunden and Mrs. Allen are children of the marriage, and it prays that certain instruments executed by said Cox, under which defendants set up title, be decreed null, and that Mrs. Cox be decreed to be the owner of one half, and usufructuary for life of the other half, of said land, and that the other two persons mentioned be decreed to be the owners of an undivided two-fifths of one undivided half of said property, subject to the usufruct of their mother. It was subsequently ascertained that Mrs. Grunden is the daughter of Mrs. Cox by a prior marriage, and she is eliminated from the case. The facts are: That John A. Cox, Sr., was married four times; that by one of his prior marriages he has a son, James W. Cox, and by another he has, or had, a daughter, Susan, who is known to have had a child, neither the mother nor the child being accounted for in this litigation; that by a prior marriage Mrs. Cox has a daughter, Mrs. Grunden; and that by the

marriage between Mr. Cox, the decedent, and Mrs. Cox, the plaintiff, there are three children, Robert H. Cox, John A. Cox, Jr., and Lula, now Mrs. Allen; the last named being a coplaintiff with her mother. John A. Cox, Sr., acquired the quarter section of land in dispute by purchase from the state in 1896, during the existence of the community between him and Mrs. Martha A. Cox, the plaintiff; and, though he sold one-half of it to one Jolly, he bought it back again within a few months. On February 15, 1902, he executed two notarial acts which, respectively, purport to convey the east half of said tract to his son James and the west half to his son Robert.

The instruments (executed before the same notary) are practically identical in their recitals, which, in each case, are to the effect that the appearer "grants, bargains, sells," etc., the east or west half of the tract in question, and that the "sale is made for the consideration of the sum of taken care of my father and mother J. A. & M. A. Cox ——— dollars the ball of their natural lives, cash in hand paid, receipt whereof is hereby acknowledged." Neither of the grantees was present when the acts were executed, nor did they do anything about it until after the death of the grantor. The grantor took the acts home and gave them to his wife (plaintiff herein) telling her that she was to keep them, and that they were not intended to take effect until after her death, and she deposited them in a trunk. About five months later John A. Cox, Sr., died after an illness of but a few days, and on the following day, after the funeral, his widow, his sons James, Robert, and John, his daughter Mrs. Allen, and his widow's granddaughter, Miss Grunden, repaired to the house which had been his home, and James and Robert there came into possession of the notarial acts to which we have referred. James testifies that they were given to him and Robert by the widow, but his testimony has but little support, and the widow in flat contradiction testifies that she knew nothing about the removal of the acts from the trunk until she was told, a day or two later, that James and Robert had taken them to Shreveport and had them recorded. James was also permitted, over the objections of counsel for plaintiffs, to testify that he had advanced certain moneys to his father, and that the latter had told him that he intended to make a conveyance to him of 80 acres of the land in satisfaction of the debt thus created, and there is some corroborative testimony on that point. Robert also testified, over a similar objection, that, during the last six months of his father's life, he had lived at the homestead (being the property here in controversy) with his father and mother, and had assisted in making the crop, with the understanding that he was to share in the proceeds, and that he had paid out, after his father's death, about $300, which were due for supplies used in making the crop and for funeral expenses, etc., the probability being that with $46.50 as the price of a mule, and $40 as the price of timber sold by him, he received somewhat more than he paid out, in addition to getting his living out of the place. Subsequently—that is to say, after the death of his father—he remained on the place with his mother for about 18 months, and he rented the east half of the quarter section (supposed to belong to James) for the year 1904 for the sum of $50, which he turned over to his mother, who gave it to John to aid him in paying Robert $90, the price for which Robert sold John the west half of said quarter section assumed to have been acquired by Robert under the act executed by his father. It does not appear that either James or Robert ever bound himself in any way or to any one to maintain their parents, and, though James advanced some money to his father, Robert admits that he did not.

On January 6, 1908, John executed an instrument conveying "all his interest in and to" the entire quarter section in question to the Vivian Mercantile Company, and on March 20, 1909, that company executed an act purporting to sell to the Busch-Everett Oil Company the "west half" of said tract. James W. Cox does not appear to have made any attempt to dispose of the title to the east half, which he is said to have acquired under the act executed by his father, and he and Robert and John and the Vivian Mercantile Company have been made parties to this suit; the Vivian Mercantile Company having been called in warranty by the Busch-Everett Oil Company, and John Cox having been called in warranty by the Vivian Mercantile Company.

It is shown that at the date of the execution by John A. Cox, Sr., of the instruments to which we have referred, he and his wife had no other property than that which those instruments purported to convey, save two mules, a few head of small cattle, some of them yearlings, and a wagon. It is further shown that, after living with his mother at the home place for about 18 months following the death of his father, Robert moved away, and that his brother John took his place, and he testifies that John assumed the care of his mother, but the act by which he undertook to sell to John the 80 acres which he is said to have acquired from his father, on condition that he would take care of his father and mother for the balance of their lives, is silent on that subject, and Mrs. Cox testifies that, after an experience of perhaps two or three years, she found it impossible to live with John because his wife would not speak to her; that she spent but little time with her stepson James, visiting at his house for only a few weeks; and that she finally made her home with her own daughter, Mrs. Grunden, which is perhaps what might have been expected.

## Opinion.

Defendant's counsel argue that "the so-called donations" were "remunerative donations, or onerous donations, and that the rules applicable to donations do not apply to them where it is practically conceded that the obligations discharged exceeded the value of the property conveyed." And they say in the brief filed by them:

"It is undisputed that at the date of the death of J. A. Cox, Sr., the land in controversy was not worth exceeding $3 per acre, and J. W. Cox, having advanced to his father $600 or more, had paid for his part of the land many times over, and R. H. Cox, in the support of his mother for about 18 months after the death of his father, and by the payment of the debts of the father, amounting to something over $300, had more than paid the value of the land which was transferred to him."

A remunerative donation is one "the object of which is to recompense for services rendered." C. C. 1523. And a "giving in payment is an act by which the debtor gives a thing to a creditor, who is willing to receive it in payment of a sum which is due him." C. C. 2655.

[1] It is not pretended that J. W. Cox rendered any service to his father, but he was permitted to introduce parol evidence to show that his father was his debtor for money advanced, and that the purpose of the "so-called donation" was to pay the debt thus due him. We are of opinion that the evidence was improperly admitted, since the purpose of the instrument referred to is expressed upon its face, in writing, and John A. Cox, Sr., having alone executed it, and having so disposed of it that it never saw the light until after his death, there is no one who is competent to testify that his purpose was other than that which he himself thus stated it to be in the written instrument under which defendant is asserting title. It may be that at one time or another he told his sons James and Robert that he intended to convey to each of them 80 acres of his land, but he evidently had his

own ideas as to the time when, and the conditions under which, such conveyances should take effect, and when he finally acted his action took the form of instruments whereby, on the condition that his sons should take care of him and his wife for the balance of their lives, they were to get the land, upon the death of his wife (in the event of her surviving him, for there is nothing in the record from which it can be deduced that he intended, under any circumstances, to leave either his wife or himself destitute). ·

If, however, it could be conceded that the purpose of the "so-called donation" as to James Cox was to pay a debt which the "so-called donor" owed, the instrument running in his favor was void, because the thing purporting to have been given was never delivered, and the donee or creditor never consented to receive it in payment. And for much the same reason—that is to say, because it purports to impose upon the "so-called donee" the obligation of taking care of his parents for the balance of their lives, and the donee not only never agreed to do so, but never heard of the obligation until after the death of the "so-called donor"— the instrument in question cannot be considered effective either as an onerous donation or as a commutative contract. And the last remarks apply with equal force to the instrument running in favor of Robert, with respect to whom it is said that, after the death of his father, he took care of his mother for 18 months and paid about $300 of his father's debts. The facts in that connection, however, are that for 18 months after his father's death he did the outside work at the home place while his mother did the inside work, and that the two of them eked out a living in that way; and that, when about six months before the death of his father he came to the place, his father agreed that, in consideration of his

assisting in making it, he should have a share of the crop. He and his father, therefore, planted the crop and cultivated it up to a short time, perhaps as much as a month, prior to July 23d, when the father died, and thereafter the son gathered the crop, consisting of 6 bales of cotton and 200 bushels of corn, and presumably sold it, as he also sold a mule and a lot of timber, and from the money so realized he paid the debts, which were, for the most part, due for advances and supplies used and consumed in the making of the crop.

Those things, however, happening, as they did, not only long after the execution by John A. Cox, Sr., of the instrument here relied on by defendants, but after the death of Cox, could have no effect in infusing vitality in that instrument, since it purported to bind Robert, who was not a party to it, and who, prior to his father's death, knew nothing of the condition imposing the obligation, and, after that event, could do nothing in the matter, since the offer which his father may have intended to make (such as it was) was withdrawn by his death and could no longer be accepted. Beyond all that has thus been said, and assuming for the moment that the two donees had been parties to the two acts of donation, those acts would have been void, since the donor thereby divested himself of his property and the property of the community, without leaving enough for the support of himself and his partner in community; it being well settled that an agreement on the part of the donee to maintain the donor during life is not a sufficient consideration for an onerous donation in such case. Lagrange v. Barre et al., 11 Rob. 302; Harris v. Wafer, 113 La. 822, 37 South. 768; Ackerman v. Larner, 116 La. 117, 40 South. 581; Rocques v. Freeman, 125 La. 60, 51 South. 68.

In the case of Vick v. Deshautel, 9 Mart. (O. S.) 85 (cited by counsel for defendant),

it does not appear that the donor divested himself of all his property, and in the case of Landry v. Landry, 40 La. Ann. 229, 3 South. 728, though the donor appears to have done so, the suit to annul the contract was brought by certain heirs of the donor, against other heirs by whom the contract had been fully executed at an expense exceeding the value of the property donated. It is said:

"Conceding that the acts were both donations, pure and simple, and that they were both informal and illegal, all of this was waived by the plaintiff by the voluntary execution of the same after the death of the donor. It is not disputed that they either delivered the acts to the so-called donees after the death of J. A. Cox, Sr., or that they acquiesced in such delivery, and that they remained silent and made no objections to this delivery of the acts. Indeed, as to Mrs. Cox it is admitted that she assisted J. A. Cox, Jr., in the purchase of part of the property from R. H. Cox, furnishing part of the purchase price, and she recognized him as the owner of that part transferred to him and in every way recognized the validity of the transfer to him."

The evidence satisfies us that neither Mrs. Cox nor Mrs. Allen had anything to do with the delivery of the acts to the donees, or knew when or how the donees came into possession of them. It is true that, a few days after the donees had caused them to be recorded, Mrs. Cox was told what had been done, and she seems to have considered, as the action had been taken by her husband's son (James), who appears to be prosperous and is no doubt intelligent, and her own son (Robert), that there was nothing that she could do about it. It is not shown, however, that she had ever read the acts in question or that she knew their purpose save, in a general way, that it was to convey the property, at her death, to the two donees, or that she knew what her rights were.

[2] However that may be, there was no conveyance, and for that reason nothing that she could ratify, and, if there had been a conveyance, she could not have ratified it or have estopped herself, as to the donees or those to whom knowledge of their title is brought home or may be imputed, from suing to set it aside, because it would have been in violation of a prohibitory law enacted in the interest of public order and good morals. Ackerman v. Larner, 116 La. 115, 40 South. 581, and authorities there cited. As to Mrs. Allen, the evidence as to the amount of information that she possessed is altogether vague and uncertain. It does not appear that she ever saw the acts or ever heard of them until, as it is said, somewhat uncertainly in the testimony of the interested defendants, she was told that they had been recorded, but no one pretends to say that she was told, or that she knew, what they contained. Counsel for defendants further say:

"The Busch-Everett Oil Company, examining the act in question here [referring to the supposed act of donation from John A. Cox, Sr., to Robert H. Cox, under which said company claims title], found that it was an onerous donation and were justified in assuming that it was perfectly legal," etc.

What the Busch-Everett Oil Company found was an instrument in the form of a contract, wherein one party was said to convey his property to another in consideration of the assumption by the other party of a certain obligation, but the instrument upon its face lacked that feature which is of the essence of all contracts imposing reciprocal obligations—the signature and consent of one of the supposed contracting parties. It was therefore no contract at all, and, save for the language used in its body, did not have even the appearance of a contract. We doubt whether J. W. Cox advanced to his father as much as $600, but assuming that he did so, and supposing that, in order to recover it, he had provoked an administration of the succession, he would have realized nothing, since the claim of his stepmother, as a widow in necessitous circumstances, would have absorbed all that there was. It is shown that the Busch-Everett Oil Company drilled a well which, it is said, will pro-

duce gas, but it seems that, for some reason unexplained, the well has remained "capped," and, up to the date of the trial in the district court, had produced nothing.

The company prays in the alternative, and in case of its eviction, that it have judgment against plaintiff for $7,500, representing the cost of the well, and against its vendor for $2,000, representing the price paid by it for the land. The Vivian Mercantile Company, vendor of the Busch-Everett Oil Company, and called in warranty by it, calls in warranty its vendor, John A. Cox, Jr., but he does not appear to have called in his brother Robert. The land in question—S. W. ¼ of section 29, township 22, range 15 west, Caddo parish—belonged to the community existing between John A. Cox, Sr., and his wife, and upon the death of John A. Cox, Sr., the widow, being the owner of an undivided half interest in it, became the usufructuary of the undivided three-fifths of an undivided one-half representing the interest inherited by the children of her marriage with John A. Cox, Sr., and those children inherited the naked ownership of said three-fifths of said other half interest, subject to the usufruct of their mother; the remaining two-fifths interest in the undivided half which had belonged to decedent devolving upon his two children by his previous marriages, free of such usufruct.

We can see no reason why Robert H. Cox and John A. Cox, Jr., should not be bound by the title set up by the Busch-Everett Oil Company to the extent of the naked ownership of the two undivided fifths of one undivided half of the quarter section inherited by them from their father.

Mrs. Cox is entitled to be put in possession as owner of one-half and as usufructuary of three-fifths of one-half in indivision of the entire tract.

The Busch-Everett Oil Company may, however, elect to retain its naked ownership of the interests inherited by Robert and John, and acquired by it through mesne conveyances, and James Cox will retain his ownership of the interest inherited by him from his father.

It will be seen that, with respect to the demand in reconvention and the call in warranty of the Busch-Everett Oil Company, a somewhat complicated situation is presented which the record does not enable us to disentangle. We have therefore concluded to adjudicate upon the rights of the plaintiffs as above indicated, and to remand the case for such further proceedings as the parties may see fit to take, reserving to the Busch-Everett Oil Company the right to retain such possession as it now has until the matter of its demand for compensation for improvements shall have been determined.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there now be judgment in favor of plaintiffs, Mrs. Martha A. Cox and Mrs. Lula M. Allen, wife of Milton Allen, and against the defendants before the court, annulling and avoiding and declaring of no effect the instruments executed by John A. Cox, Sr., of date February 15, 1902, purporting to convey the land here in dispute to James W. Cox and Robert H. Cox, respectively; decreeing said Mrs. Martha A. Cox to be the owner of an undivided one-half interest in said land, to wit, the S. W. ¼ of section 29, township 22, range 15 west, in the parish of Caddo, and to be the usufructuary of an undivided three-fifths of the remaining undivided one-half of said land, and to be entitled to possession of said undivided eight-tenths interest, without prejudice, however, for the present, and until the claims of the defendant, the Busch-Everett Oil Company, for improvements placed upon said land shall have been determined and satisfied, to the possession which said company now en-

joys of the west half of said quarter section. It is further ordered and adjudged that there be judgment in favor of said Mrs. Lula M. Allen, wife of Milton Allen, and against said defendants, decreeing her to be the owner of an undivided one-fifth of an undivided one-half of said quarter section of land, subject to the usufruct of said Mrs. Martha A. Cox, and subject, as hereinbefore decreed, to the possession enjoyed by the Busch-Everett Oil Company. It is further decreed that this case be remanded to the district court for further inquiry into, and adjudication upon, the rights of the parties with respect to the demand in reconvention of said Busch-Everett Oil Company and the call in warranty of said company and of the Vivian Mercantile Company. It is further decreed that, as between plaintiffs and defendants, defendants pay all costs incurred up to date, and that, as between the defendants, inter sese, the question of their liability for such costs, respectively, awaits the further decision of the court.